IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **THORNETTE A. SIMPSON,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Case No.: SAG-22-1719 |
| v. | * | |
| | * | |
| **DEPARTMENT OF JUVENILE SERVICES, STATE OF MARYLAND,** | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Thornette A. Simpson filed an Amended Complaint against her former employer, the Maryland Department of Juvenile Services ("the Department"). In her Amended Complaint, Simpson asserts that the Department subjected her to retaliatory employment actions after she filed an administrative complaint alleging discrimination. ECF 20. This Court set a schedule for discovery, and the discovery period has now concluded.[1] ECF 40. Currently before this Court is the Department's motion for summary judgment pursuant to Rule 56. ECF 44, 48-1. Simpson has opposed the motion, ECF 49, 51, and the Department has replied, ECF 53. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons explained below, the Department's motion for summary judgment will be granted.

---

[1] In a recent status report, the parties indicated that Simpson now desires to take depositions, but has not done so. ECF 42. The scheduling order permitted depositions, but like other discovery, they had to be pursued during the allotted discovery period. This Court notes that both Simpson and her supervisor, Debbie Thornton, testified under oath at the contested administrative hearing about these topics, and those transcripts are contained in the record. ECF 44-6, 44-7, 44-8.

I.     BACKGROUND

Under the governing standard for summary judgment motions, the following facts are viewed in the light most favorable to Simpson, the non-moving party. Simpson applied for a job with the Department in 2019. ECF 44-6 at 8.[2] Her application represented that she had experience and training in the areas of grants and procurement. *Id.* at 6. Simpson accepted a position as Administrator II in the Department's procurement unit in late 2019, starting work on January 15, 2020. ECF 44-4 ¶ 6, ECF 44-4 at 4–5. At the time of her hire, her direct supervisor was Procurement Officer III, Eureka Yorkman. ECF 49-1 at 10; ECF 44-6 at 15–16.

Simpson's initial training included a basic orientation, training by a colleague on the financial management system ("FMIS") used by procurement, and generalized training from the Deputy Director of Procurement, Nneka Willis-Gray. *Id.* at 13–15. Simpson also met with Yorkman every two weeks. *Id.* at 15–16. Eventually, Willis-Gray became Simpson's direct supervisor and they continued to meet at least once every two weeks. *Id.*

In March 2020, just two months after Simpson's hire, employees shifted from working in the office to working from home because of the Covid-19 pandemic. *Id.* at 15. On May 26, 2020, Debbie Thornton, the Director of Procurement, promoted Simpson to the position of Procurement Officer III, which increased Simpson's salary by about $10,000. *Id.* at 18. Thornton made that decision because she knew that Simpson had taken a pay cut to accept her initial position, and because her job application had cited experience writing solicitations. ECF 44-7 at 48. Simpson reviewed the job description for Procurement Officer III before she accepted the promotion. ECF 44-6 at 18.

---

[2] For all pincites, this Court uses the ECF page numbers in the header at the top of the page.

Shortly after her promotion, Willis-Gray assigned Simpson a large solicitation for the Teen Court Diversion ("TCD") Program. *Id.* at 22-23; 44-7 at 6. With the assignment, Simpson received guidance, a contact person named Lisa Reynolds, and relevant documentation. ECF 44-6 at 23. The Department wanted to begin the TCD service on April 1, 2021. *Id.* at 29. The timetable appeared feasible because the TCD solicitation had been the subject of an interagency agreement, allowing much of the information for the solicitation to be obtained from that agreement. ECF 44-7 at 7, 11.

Simpson met with her TCD program contact, Reynolds, within days of receiving her assignment. ECF 44-6 at 23. Reynolds provided Simpson with the relevant documentation and information for the solicitation. ECF 44-4 at 87.

The procurement group continued to provide online training to Simpson and its other employees throughout 2020. ECF 44-6 at 14. Training afforded to Simpson included a four-and-one-half hour training about solicitation formatting in May, *id.* at 21; a four-hour training about the procurement process in June, *id.* at 21; and a three-hour, one-on-one FMIS training in October. *Id.* at 21–22. In addition, beginning in July, 2020, Willis-Gray held meetings with Simpson and other supervisory staff to discuss relevant Code of Maryland Regulations ("COMAR") provisions. *Id.* at 16.

Willis-Gray evaluated Simpson's performance on July 29, 2020. ECF 49-1 at 1-4. Overall, Willis-Gray rated her performance satisfactory. *Id.* at 4. The performance evaluation commended Simpson for her positive and uplifting attitude and her detailed communication, and also identified several areas requiring improvement, including providing timely and accurate information to clients, appropriately prioritizing work, and completing and submitting assignments on time. *Id.* at 1-4.

During the course of her work on the TCD solicitation, Simpson continued to meet with Willis-Gray at least twice per week. ECF 44-6 at 29. In addition, Simpson provided weekly status updates indicating that she would finish the draft solicitation by September 18, 2020, as required to meet the goal of commencing the TCD services on April 1. ECF 44-4 at 74–75, 77, 79. Willis-Gray met with Simpson for ninety minutes on August 12, 2020 to provide Simpson with specific guidance about the TCD solicitation. ECF 44-6 at 24; ECF 44-7 at 7–8. A few weeks later, on September 1, 2020, Reynolds followed up with Simpson to ensure the project was on track to meet its timeline. ECF 44-6 at 26, 27. Simpson agreed that she was and that she would have the draft solicitation to Reynolds within two weeks. ECF 44-6 at 27; ECF 44-4 at 73. Over time, Simpson extended her deadline from September 18 to October 23, 2020 to give Reynolds the completed draft. ECF 44-6 at 27–29. In her weekly status reports to her supervisors, Simpson never indicated that she was having problems with the assignment or would be unable to complete the solicitation on time. *Id.* at 27–29, 31, ECF 44-4 at 74–75, 77, 79.

On October 20, 2020, Reynolds contacted Thornton directly to ask about the status of the solicitation. ECF 44-4 at 86. Thornton and Willis-Gray reviewed Simpson's status reports, which represented that the solicitation was on track. *Id.* They met with Simpson later that day to discuss the status. *Id.* During the meeting, they learned that the solicitation was in the wrong format and needed to be converted from an invitation for bids to a request for proposals (RFP). ECF 44-7 at 8. Simpson advised that she had sent the draft solicitation to Reynolds, but that Reynolds "made numerous requests to make changes and delay[ed] providing information requested to complete the solicitation." ECF 44-4 at 86. Willis-Gray was concerned, because in their prior meetings and status reports Simpson had never previously mentioned any delays in receiving information or

completing the solicitation. *Id.* Later that same day, Reynolds told Willis-Gray that she had never received a completed solicitation draft from Simpson. *Id.*

Thornton and Willis-Gray then directed Simpson to send them the revised solicitation, revised timeline, and financial proposal. ECF 44-7 at 8, ECF 44-4 at 86. Willis-Gray scheduled another meeting with Simpson for October 23 to review those documents and to prepare for their meeting with Reynolds on October 26. ECF 44-4 at 86–87.

Simpson then called out sick on October 22 and 23, although she stated she would participate in a meeting on Friday the 23rd. *Id.* at 87. Instead, Willis-Gray asked that Simpson send the documents that had been requested on October 20. ECF 44-7 at 8. Simpson agreed but never sent them. *Id.* However, on October 23, 2020, while out sick, Simpson filed a detailed complaint with the Department's Office of Fair Practices ("OFP"). ECF 44-3 at 4–19. The complaint alleged, in relevant part, that Thornton, a Black woman, had stated, "Black women are the worst!" to her supervisees. *Id.* at 7–8.

On the morning of Monday, October 26, Simpson asked if she could provide Willis-Gray the requested TCD documents by close of business. ECF 44-6 at 31. Willis-Gray said no, because they had a meeting with Reynolds to discuss the documents at 1 pm that day. *Id.* Simpson stated that she had been sick on Friday, October 23 and the documents would not be completed by 11:30 am. ECF 44-6 at 31–32; ECF 44-4 at 84. Willis Gray responded:

> We had a meeting on October 20th stating what needed to be done to meet these dates. I understand you were sick but you also advised on Friday that you would send me the documents. This implied to me that the documents were updated and completed. Send me what you worked on from October 20-21 and from this morning by 11:45 am today. I have scheduled a meeting for noon today, be prepared to go over the documents.

ECF 44-4 at 83. Simpson responded, explaining what little work she had completed. *Id.* Willis-Gray responded that if she had been unable to complete the work in a timely fashion, she should have told Willis-Gray before the date of the meeting. *Id.*

When Willis-Gray and Thornton met with Simpson to review the documents on October 26, they found that the documents had not been completed. ECF 44-4 at 87. They again extended the deadline and asked for the completed documents on October 28. *Id.* But on that date, they found that Simpson had made no significant changes to the RFP. ECF 44-7 at 8. Simpson again claimed that she lacked the basic information she needed to complete the solicitation. ECF 44-4 at 87.

Instead, on October 27 and October 28, 2020, Simpson engaged in an email exchange with Willis-Gray requesting training in three specific areas. ECF 49-1 at 6–7, 13. Willis-Gray responded by stating that one of the three areas Simpson identified was outside the realm of procurement, providing a list of trainings that Simpson had already participated in, reminding her of an upcoming training opportunity in one of the three areas, and listing some online training resources. *Id.* Willis-Gray opined that the other types of training Simpson requested were suited to an entry level procurement employee and not to a supervisory level employee such as Simpson. *Id.*

On October 29, Thornton, Willis-Gray, and Simpson met with Reynolds and her team to review the TCD solicitation. *Id.* Reynolds stated that she had provided all of the required information to Simpson by August 6, and produced email records to support her contention. *Id.* After the meeting, Reynolds reached out to Thornton and Willis-Gray to "voice her discontent regarding [] Simpson's allegations that [Reynolds] caused the delay in completing the solicitation," considering that she had provided all the necessary material by August 6 and had never received any draft from Simpson. *Id.* Willis-Gray gave Simpson one additional opportunity to finalize the

6

solicitation, but never received it. *Id.* She reassigned the solicitation to another procurement officer on November 5, 2020. *Id.* On November 18, OFP completed its investigation of Simpson's discrimination and retaliation complaint and found it "unsubstantiated." ECF 44-3 at 31–36.

Willis-Gray investigated the timeline of events relating to the solicitation for the TCD Program and collected supporting documentation. ECF 44-7 at 14. Thornton and Willis-Gray presented the investigation report to Simpson on November 23, 2020. *Id.* at 11. Simpson maintained that her failures were due to insufficient training. *Id.* at 12; ECF 44-6 at 35. Ultimately, Thornton and Willis-Gray issued a written reprimand. ECF 44-7 at 49; ECF 44-4 at 67-69. Simpson appealed the reprimand to the Office of Administrative Hearings, where an administrative law judge (ALJ) conducted a three-day hearing.[3] ECF 44-6, 44-7, 44-8. At the conclusion, while the ALJ agreed that Simpson had insufficient training to complete the TCD solicitation, the ALJ affirmed the reprimand because Simpson failed to notify her supervisors that she could not perform her assignments, made false statements to her supervisors in status reports and meetings, and made false statements about Reynolds's involvement in the project delays. ECF 44-4 at 41. The ALJ also concluded that the evidence did not suggest that Simpson had been reprimanded in retaliation for having made a complaint to OFP. The ALJ reasoned:

> Since the Complaint was (by [Simpson's] memory) filed around the due date for the TCD project to be submitted for approvals, and since [Simpson] knew that she had not completed the tasks assigned, I cannot rely on her testimony alone to establish that she was the victim of retaliation. [Simpson] knew in late October that she was in trouble over the incomplete TCD assignment, and she may or may not have been looking for an explanation for her failures other than the need for additional training.

*Id.* at 39.

---

[3] The ALJ's hearing regarding the reprimand was consolidated with the hearing regarding Simpson's eventual termination.

Simpson also worked on another assigned solicitation, titled "Life Skills and Self-Improvement". ECF 44-5 at 4–7. Procurement officers submit their solicitations in "final form," which means that "all comments have been addressed and removed; all track changes or highlights removed; all questions answered; and all hyperlinks are checked to ensure correct and working." *Id.* ¶ 6, at 13. However, on November 13, 2020, Simpson sent a solicitation to the Office of State Procurement (OSP) that was not, but should have been, in final form. *Id.* at 5. The representative from OSP met with Simpson for two hours, which exceeds by about ninety minutes the typical length of time necessary to meet with a representative, even where a solicitation has major issues. *Id.* Following the meeting, Simpson sent the solicitation to Willis-Gray for her review on December 7, 2020. *Id.* Willis-Gray responded, alerting Simpson to specific issues she needed to address before resubmitting it on December 9. *Id.* at 9. Instead, Simpson submitted it on December 10, advising Willis-Gray that there were still formatting issues. ECF 44-5 at 10. Willis-Gray reminded Simpson that it was her job to put the solicitation in final form. *Id.* Simpson re-submitted a new version later that day, but upon review, Willis-Gray recognized that Simpson had made few changes since the last insufficient version. *Id.* at 11. Willis-Gray scheduled a 30-minute meeting with Simpson for December 16 to review the solicitation, and then gave her until the end of the day to correct the identified issues. *Id.* Instead, Simpson submitted another version late in the day on December 17, 2020, which was still not finalized. *Id.* at 12. Simpson submitted her last version on December 24, and Willis-Gray still had to correct formatting issues before submitting it to the OSP representative. *Id.* at 6.

Ultimately, on January 15, 2021, Thornton and Willis-Gray imposed a three-day forfeiture of leave on Simpson for her continued failure to submit a final solicitation. ECF 44-5 ¶ 4. While Simpson claimed she had been advised not to use an updated template, the OSP representative

stated that the template had been Simpson's decision. *Id.* at 6, 8. While Simpson claimed that she did not realize the solicitation had been rejected for formatting, Willis-Gray's emails listed all of the formatting errors. *Id.* at 6, 9–12. And Simpson had attended 4.5 hours of training on May 29, 2020 regarding how to format solicitations. *Id.* at 6.

In the same window of time, on Friday, December 11, 2020, Willis-Gray directed Simpson to route a contract for the appropriate signatures so that services to the youth could begin on January 1, 2021. ECF 44-4 at 146. Willis-Gray assigned the project to Simpson because she was familiar with it from a prior project. *Id.* Given the short time frame, Willis-Gray instructed Simpson to send the contract to the contractor that same day, to begin routing it for Departmental signatures the following Monday or Tuesday. *Id.* Instead, Simpson first sent the documents to the contractor on Tuesday, December 15. *Id.* at 147–48. The contractor identified some issues that needed to be addressed. *Id.* at 149. On Friday, December 18, Simpson submitted the documents to Willis-Gray, who provided comments the same day. *Id.* at 151–53. On Monday, December 21, Simpson submitted the documents to budget for approval and reached out to the contract monitor. ECF 44-7 at 15–16. Her telework plan on December 22 reflected that she worked on "processing solicitation for routing (Request to Budget for release for routing and prepare package to send for legal sufficiency)." ECF 44-4 at 221. However, Simpson left for her pre-planned holiday leave on December 24 without telling Willis-Gray that she had been unable to complete the routing process. ECF 44-7 at 15–16. She did not advise Willis-Gray until she returned on January 5, 2021. *Id.* Prior to the holidays, all procurement team employees had been specifically directed to "[n]otify and/or alert your supervisor of any project that may need their attention in your absence, to ensure that all bases are fully covered while your [sic] away from the office." ECF 44-4 at 145.

On January 15, 2021, budget and finance reached out to Willis-Gray asking for the southern region's purchase orders. *Id.* at 166–67. Those had been assigned to Simpson for completion in August, 2020 and she had been given a week to turn them in. ECF 44-7 at 17. In October, 2020, budget and finance had asked about the missing purchase orders, and Simpson had told Willis-Gray that she was having difficulty using FMIS. ECF 44-4 at 135; ECF 44-7 at 17. Willis-Gray conducted a personal FMIS training session for Simpson, and Simpson advised after the training that she understood FMIS and had no additional questions. ECF 44-4 at 135; ECF 44-7 at 18. Nevertheless, she did not complete the purchase orders. ECF 44-7 at 18. After receiving the January 2021 request from budget and finance, Willis-Gray asked Simpson to provide an update by January 19 at noon. ECF 44-4 at 166. After receiving no response from Simpson, Willis-Gray followed up on January 25. ECF 44-4 at 170. At that time, Simpson advised that she had been off sick the week prior, which is why she did not respond. ECF 44-7 at 18. Simpson still did not provide the requested information, although Willis-Gray made three additional requests on January 25. ECF 44-4 at 168–70. Willis-Gray then reviewed Simpson's timesheet for the week prior, noting that Simpson had worked eight hours on January 19 and five hours on January 20 before taking leave for the rest of the week. *Id.* at 174–75. Thus, Simpson could have responded to Willis-Gray's request on January 19. Moreover, Simpson did not adhere to the procurement group's policy requiring an employee to call a supervisor before taking unscheduled leave. *Id.* at 143; ECF 44-7 at 20. She sent an email on the 20th stating that she had "a family emergency and will return to work tomorrow." ECF 44-4 at 173.

Thornton met with Simpson on Friday, January 29, 2021 to discuss her performance issues and to provide her with Willis-Gray's investigative report. ECF 44-4 at 133–37; ECF 44-7 at 21. Simpson stated that she had sent Willis-Gray an email advising that she would be unable to route

the contract before January 1, 2021, but she never provided them with a copy of that email when asked for it. ECF 44-7 at 22, 24, 25. Simpson also alleged that she had indicated her inability to complete the routing task on her telework plans (TWP), but the TWP simply states that Simpson is "processing solicitation for routing," without an indication that she would be unable to complete the task before her leave. *Id.* at 25, 26; ECF 44-4 at 221. With respect to her unscheduled leave, Simpson alleged that she had been mistaken about the dates she was out, and further alleged that she had emailed her supervisor and provided a medical note. ECF 44-4 at 205, 206.

Willis-Gray's investigation memorandum set forth a series of regulations and policies she believed Simpson had violated. ECF 44-4 at 133–37. Thornton recommended Simpson's termination to the Secretary of Juvenile Services because Willis-Gray was spending hours with Simpson, who would not indicate she was having any issues with assignments until "somebody would ask" about them, and because she was simply not formatting documents correctly. ECF 44-7 at 54. The Secretary approved Simpson's termination, effective February 3, 2021. ECF 44-4 at 131. Simpson appealed the termination, and an ALJ affirmed the termination after a hearing, which included Simpson's allegations of retaliation. *Id.* at 222–43.

## II. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer

11

specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

In reviewing this motion, the Court also considers Simpson's self-represented status. In *Bullock v. Sweeney*, 644 F. Supp. 507, 508 (N.D. Cal. 1986), the court found that a pro se plaintiff's pleadings and motions must be liberally construed. *See also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (noting that writings by self-represented complainants are held to "less stringent standards

than formal pleadings drafted by lawyers"). Although the Court applies that more liberal standard in reviewing a self-represented plaintiff's response to a defendant's summary judgment motion, the plaintiff "may not rest on [her] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue" to be tried before a jury. *Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1120 (4th Cir. 1995) (citations omitted); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994), *cert. denied*, 513 U.S. 813 (1994).

### III.    ANALYSIS

Title VII prohibits an employer from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Relevant here, Title VII also prohibits an employer from retaliating against an employee for "participating in a Title VII proceeding or opposing an employer's discriminatory practices." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019) (citation omitted). Specifically, 42 U.S.C. § 2000e-3 states:

> It shall be an unlawful employment practice for an employer to discriminate against any of [her or] his employees . . . because [she or] he has opposed any practice made an unlawful employment practice by [Title VII], or because [she or] he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Absent direct evidence of retaliatory animus, Title VII retaliation can be established by the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973). *Foster v. Univ. of Md. – E. Shore,* 787 F.3d 243, 249 (4th Cir. 2015). Under that framework, Plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). To prove a prima facie case, a plaintiff must show "that (1) the plaintiff engaged in a protected activity, . . . ; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the

13

employer's adverse action." *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted). The burden then shifts to the employer to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *Foster,* 787 F.3d at 250. If the employer makes this showing, the burden shifts back to the plaintiff to show that the employer's purported nonretaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)).

The parties' dispute centers around Simpson's ability to prove the third element, a causal connection between her OFP complaint and the Department's actions. Under the *McDonnell Douglas* framework, causation must be proven at two different stages: first, in making a prima facie case, and second, in proving pretext. *Foster,* 787 F.3d at 250. At the pretext stage, the applicable standard is but-for causation: that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 252; *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). In other words, simply showing that retaliation was a motivating factor is insufficient. *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018). The employee bears the burden of proving that but for the retaliatory motive, the adverse action would not have occurred. *Id.*

While Simpson's allegations sufficed to plead a viable claim under the low bar applicable at the motion to dismiss stage, under the more robust evidentiary standard required to survive summary judgment, her claims fail to establish a genuine issue of material fact regarding causation. She has shown a close temporal proximity between her OFP complaint and her supervisors' investigation of her actions relating to the TCD solicitation. Such evidence can be enough to establish a prima facie case of causation. *See Hammoud v. Jimmy's Seafood, Inc.*, 618 F. Supp. 3d 219, 238 (D. Md. 2022) ("Temporal proximity between an employer's knowledge of protected

14

activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is very close.") (internal quotation marks and citation omitted). At this stage, however, the uncontroverted evidence shows that the supervisors' dissatisfaction with Simpson's handling of the TCD solicitation predated, and in fact led to, the unpleasant telephonic interaction that triggered Simpson's OFP complaint. Thus, the supervisory concern about her unsatisfactory performance presented a legitimate, non-discriminatory reason that existed well before she made her OFP complaint. The walls were starting to close in, in that Simpson would no longer be able to delay a close review of the project that she was supposed to have been working on for months and had repeatedly represented was "on track" for timely completion. In such circumstances, there can be no fair inference that discipline based on preexisting supervisory dissatisfaction and work deficiencies constituted retaliation for a discrimination complaint made after those concerns arose. *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) ("[A] complaining worker is not . . . insulated from the consequences of insubordination or poor performance."). Certainly, there has been no showing here that the supervisors' performance concerns were pretextual or that Simpson's time-sensitive work was adequately completed by the assignment deadline.

Simpson suggests that unsatisfactory performance was a pretext for retaliation because her supervisors failed to provide her with adequate training. Late in October, 2020, during her intense conversations with her supervisors about the overdue and incomplete TCD project, Simpson requested extensive and basic training. ECF 49-1 at 6–7, 13. Her supervisor responded that (1) she had been afforded ample training and was registered for additional training, and (2) some of the training she was requesting was either not part of her job duties or was appropriate only for a lower-level employee, not a supervisory level employee. *Id.* Simpson does not contest that she

received formal training and had regular meetings with her supervisors to discuss any issues that arose in her work. She also does not show that she was treated differently than similarly situated employees with respect to training, only that she made special requests for extra, intensive training that her employer did not deem warranted. Thus, Simpson's claim of inadequate training is not well founded. Even if it was well founded, it would not establish that the Department investigated her "because" she filed an OFP complaint. Insufficient training might lead to poor performance, independent of whether Simpson filed the complaint.[4]

As to the Department's later disciplinary actions against Simpson, such as the three-day forfeiture of leave in January, 2021, and the subsequent termination in February, 2021, Simpson has not adduced evidence of a sufficient temporal connection to her October, 2020 OFP complaint to even make a *prima facie* case of retaliation. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (finding that a lapse of three months was too long to establish a causal connection by temporal proximity alone). But regardless, even if she had, the Department has offered, and has presented ample evidence of, a legitimate non-discriminatory basis for all of its actions: Simpson's poor performance, including her failure to complete assignments in a timely fashion, her failure to share accurate information about the status of her assignments, and her repeated provision of untruthful information to her supervisors. Employers may lawfully discipline and even terminate employees for such performance issues. *Fry v. Rand Constr. Corp.,* 964 F.3d 239, 246 (4th Cir. 2020). Moreover, this Court does not second-guess an employer's evaluation of its employee's performance. *See id.* at 249 (quoting *Liang v. Federal Exp. Corp.,* 703 F.3d 713,

---

[4] This Court rejects the suggestion that the denial of training actually had an adverse impact on Simpson's job performance. The issues with Simpson's work leading to her removal from the TCD project were not related to a lack of training, but to her lack of diligence in meeting deadlines, her failure to follow procedures, and her lack of candor in her dealings with her supervisors.

717 (4th Cir. 2013) ("And it is not the courts' place to determine whether [the employer's] assessment of [the employee's] performance issues was 'wise, fair, or even correct, so long as it was truly the reason for [her] termination.'").

Of course, Simpson has adduced evidence (albeit not always in an admissible form) that she received a satisfactory employment evaluation and a promotion early in her tenure, that her work experiences were sometimes unpleasant, that she did not have enough training and experience to perform some of her assigned tasks, and that her supervisors sometimes behaved unprofessionally towards her and other employees. ECF 49-1. But that evidence, even taken as true, does not suffice to meet her hefty burden at the summary judgment stage to show a genuine issue of fact that the performance issues cited by the Department constituted pretext for retaliation. The uncontroverted evidence shows a robust record of well-documented performance concerns spanning many months and multiple assignments. With that record, she is unable to show that she would have retained her position (or avoided other discipline) but for the OFP complaint she filed. Summary judgment therefore must be granted.

## IV.   CONCLUSION

For the reasons stated above, the Department's motion for summary judgment, ECF 44, is granted and judgment will be entered for Defendant against Plaintiff. A separate Order follows.

Dated: January 30, 2024                        /s/
                                  Stephanie A. Gallagher
                                  United States District Judge